WASHBURN LAND COMPANY, Respondent, vs. SANBORN, Appellant.

*September 19—October 8, 1912.*

*Tax titles: Redemption: Action to bar former owners: Moneys paid in lieu of deposit: Consideration: Recovery back: Limitation of actions: Champerty.*

1. A tax lien which has ripened into a tax deed is not subject to redemption.

2. Pending an action under sec. 1197, Stats. (1898), by grantees in a tax deed to bar the former owners, one to whom the defendants had deeded the land paid to plaintiffs' attorney a sum of money to cover the taxes, interest, charges, and costs of suit, for the purpose of wiping out the tax lien and upon the understanding that said attorney would try to procure from plaintiffs a quitclaim deed to the payor. Plaintiffs refused to give the quitclaim deed, and did not accept the payment. Thereafter the money was treated as equivalent to a deposit in court pursuant to sec. 1200, Stats. (1898). Final judgment went in favor of plaintiffs. *Held,* that the payor had received no consideration for the money so paid to plaintiffs' attorney, and might recover it back.

3. The money so paid to plaintiffs' attorney having been held as a deposit for a specific purpose during the pendency of the action, the relation of debtor and creditor did not then exist between said attorney and the payor, and the time within which an action might be brought to recover the money did not begin to run until its repayment was thereafter demanded.

4. A champertous agreement under which the former owners of the land had transferred it to the payor of the money in question did not affect the agreement under which the money was paid or preclude its recovery.

APPEAL from a judgment of the circuit court for Ashland county: JOHN K. PARISH, Circuit Judge. *Affirmed.*

The issues in this case can perhaps be best understood by stating in condensed form the findings of fact and conclusions of law made by the court. As matters of fact the court found:

"(1) That on the 30th day of October, 1899, A. W. McLeod deposited with *A. W. Sanborn,* then a member of the firm of

Cate, Sanborn, Lamoreux & Park, attorneys at law at Ashland, Wisconsin, the sum of eight hundred six and 15/100 (806.15) dollars for J. W. and D. W. Emerson, the same being the amount of taxes on lands hereinbefore described with interest, as required by law, and the costs of suit in an action of J. W. Emerson and D. W. Emerson vs. A. B. McDonnell and Thomas Irvine, to foreclose tax deeds on said lands which had been deeded by said McDonnell and Irvine to said McLeod.

"(2) That A. W. McLeod requested said *A. W. Sanborn* to procure a quitclaim deed from the said Emersons to him, it having been conceded that the tax deeds under which they held were void.

"(3) That said Emersons refused to deliver such deed.

"(4) That the said *A. W. Sanborn,* after receiving said eight hundred six and 15/100 (806.15) dollars from the said A. W. McLeod, informed the said Emersons of the fact of said payment and they thereupon directed him to retain out of said sum, as attorneys' fees due from them to Cate, Sanborn, Lamoreux & Park, ninety-one dollars and 50/100 (91.50), and ratified the receiving of all of said money paid to the said Emersons through their said counsel, the said *A. W. Sanborn,* by the said A. W. McLeod.

"(5) That the money deposited and paid to the said *A. W. Sanborn* at the time of the depositing and payment thereof was the money of the said A. W. McLeod.

"(6) That the title of the said J. W. Emerson and D. W. Emerson to the lands in controversy was sustained in their action against A. B. McDonnell and Thomas Irvine, and that consequently the said A. W. McLeod received nothing for the money so deposited and paid to the said *A. W. Sanborn.*

"(7) That subsequently to the depositing and payment of said money by the said A. W. McLeod to the said *A. W. Sanborn* and the application of said sum of ninety-one and 50/100 (91.50) dollars as attorneys' fees due from the said Emersons to the firm of Cate, Sanborn, Lamoreux & Park, to wit, on July 7, 1903, the said Emersons made demand on the firm of Cate, Sanborn, Lamoreux & Park for a statement of account of the eight hundred six and 15/100 (806.15) dollars so deposited by said A. W. McLeod, and demanded that said sum be paid to them, less such sum as may be properly due said attorneys for services and disbursements in said action; that the said

money was not paid over to said Emersons pursuant to this demand.

"(8) That thereafter on the 30th day of December, 1903, the said Emersons made demand in writing on *A. W. Sanborn* that he return to A. W. McLeod the sum of $806.15 deposited by McLeod October 30, 1899.

"(9) That said sum was not returned to McLeod or plaintiff and that said *A. W. Sanborn* still retains the same and the whole thereof.

"(10) That said Emersons tendered to said Cate, Sanborn, Lamoreux & Park ninety-one and 50/100 (91.50) dollars, the amount due them for services in said action.

"(11) That the firm of Cate, Sanborn, Lamoreux & Park had an agreement with the said Emersons to perfect the title at five (5) dollars per forty."

(12) Gives a description of the lands involved in the suit of the Emersons vs. McDonnell and Irvine.

"(13) That on or before September 1, 1906, the said A. W. McLeod made demand on the defendant, *A. W. Sanborn,* for the return of said money.

"(14) That prior to the commencement of this action the said claim of A. W. McLeod for said sum of $806.15 was sold and assigned to the plaintiff herein, *Washburn Land Company.*"

As conclusions of law the court found:

"(1) That said *A. W. Sanborn* is entitled to deduct from said $806.15 the sum of $91.50, the same being due the firm of Cate, Sanborn, Lamoreux & Park for services and disbursements rendered to and for J. W. and D. W. Emerson in the said action against A. B. McDonnell and Thomas Irvine.

"(2) That the balance, to wit, the sum of $714.65, in said *Sanborn's* hands, belongs to this plaintiff herein, and it is entitled to recover the same with interest at six per cent. from September 1, 1906.

"(3) That the plaintiff have its costs and disbursements herein."

For the appellant there was a brief by *Allan T. Pray* and *Albert S. Larson,* and oral argument by *Mr. Larson.*

For the respondent the cause was submitted on the brief of *John Garvin.*

BARNES, J. There was nothing unusual about the original transaction between attorneys *Sanborn* and McLeod. The former had instituted an action to bar the former owners of certain lands under sec. 1197, Stats. (1898), and succeeding sections. The plaintiffs held a single tax deed on this land on which the three-year statute of limitations had not run, and some tax certificates which were not old enough to be deedable. The defendants had the right under the statute to set up by way of defense certain defects or irregularities which would avoid the tax deed, but as a condition of making such defenses they were obliged to deposit with the clerk of the court at the time of filing their answer, for the use of the plaintiffs, the sum for which the parcels of land were sold, with interest thereon, together with subsequent taxes paid by the plaintiffs, with interest, and allege in the answer that they had made such deposit and were willing to pay such portion of the costs and disbursements of the action as were adjudged to be just and reasonable, in case the plaintiffs elected to receive the deposit so made. After such proceedings were had, the plaintiffs might elect to receive the deposit, and as a condition of accepting the money they would be obliged to release to the defendants all their right, title, and interest in the lands. If the plaintiffs failed to accept the offer so made and the defendants prevailed on the trial, the latter were entitled to recover their costs incurred after the offer was made.

It is quite apparent from the record in this case that *Mr. Sanborn* was satisfied that the tax deed under which his clients claimed would be set aside by the court, because it was void for various reasons. *Mr. Sanborn* so stated in an affidavit which he made. This being so, and Mr. McLeod having appeared in the action as attorney for the defendants, and having expressed a willingness to pay what the statute obligated him to pay, there was apparently no controversy left. It was no doubt considered by both attorneys that the easiest and cheapest way to dispose of the case was to procure a quitclaim deed from the Emersons and pay to their attorney the money

to which they were entitled and close the matter up without further court proceedings. The arrangement fell through because the Emersons refused to execute the deed and repudiated the authority of their attorney to dispose of their suit in that way. It is true that *Mr. Sanborn* made no positive agreement to procure the deed, but he did promise to ask his clients for it, and did so. As the matter then stood, the tax deed under which plaintiffs claimed could only be wiped out by a judgment of court, and the defendants interposed an answer in the case. This answer did not allege the payment of any money into court for the use of the plaintiffs, but in lieu of such averment did allege that there had been paid to the plaintiffs the sum of $806.15 to cover taxes, interest, and charges, together with the costs of the action. This averment related to the sum paid *Sanborn*. On March 14, 1903, judgment was entered in defendants' favor on the issue so joined. Later this judgment was set aside because of an alleged champertous agreement between the defendants and their attorney, and because of such agreement judgment was rendered in plaintiffs' favor in accordance with the demand of the complaint. An appeal was taken from this judgment to this court, and it was affirmed in June, 1906 (129 Wis. 67, 107 N. W. 1037). Thereupon McLeod demanded the return of his money, which was refused.

In July, 1903, the Emersons demanded of *Sanborn* that he turn over to them the amount of money paid him by McLeod, less attorney's fees, computed according to a contract alleged to exist between the parties. This request was refused, and of the amount received there was credited to Emerson Brothers on account the sum of $717, and the balance retained as the taxable costs and disbursements. Thereafter the Emersons, apparently discovered the existence of the alleged champertous agreement, and on January 2, 1904, served on the defendant a notice to the effect that they had deposited in a designated bank, subject to his order, the sum of $91.50 in pay-

ment of his fees in the pending suit, and demanded that he return to McLeod the sum of $806.15 received from the latter. This demand was not complied with.

Two errors are assigned and argued: (1) the trial court was wrong in finding that McLeod received no consideration for the money paid defendant; and (2) it was error not to hold that the plaintiff's claim was barred by the statute of limitations.

The argument urged in support of the first assignment of error is that the money was paid as a redemption of the tax liens held by Emerson Brothers and operated to redeem the land from such liens. It is obvious that these tax liens were not redeemed. A tax lien which has ripened into a tax deed is not subject to redemption. If the Emersons had accepted this money with full knowledge of the facts they might and probably would be estopped from asserting title under their deed. But the deed would remain an apparent lien or cloud on the title until it was set aside by a judgment of court or until the Emersons conveyed to the defendants in the then pending action. It is clear that McLeod paid his money for the purpose of wiping out the tax liens and claims of the Emersons and that they were not wiped out and that he received no consideration for his money. While *Mr. Sanborn* did not agree that he would procure a deed from his clients, it was either expressly or tacitly understood that he would endeavor to do so, and that if he did not succeed in getting the deed McLeod might interpose an answer in the case and treat the money paid *Sanborn* as being tantamount to a payment into court as required by statute, and it was so treated in the subsequent trial of the case.

In support of the second error argued it is urged that in any event the relation of debtor and creditor existed between *Sanborn* and McLeod from the time the check was deposited in October, 1899, and that inasmuch as the action was not commenced until April, 1908, it was barred by the six-years stat-

ute of limitations. In this connection it was argued that *Sanborn* was not a bailee because there was no understanding that the identical thing deposited should be returned.

The relation of debtor and creditor did not exist between these parties so long as the litigation continued. The check was left with *Sanborn* as a deposit for a specific purpose, and until the case was finally determined it could not be withdrawn without loss of the right to defend the action. *Sanborn* really was in the position of trustee whose duty it was to pay the money to his former clients if they were beaten in the suit, or to McLeod if he was unsuccessful. So long as the litigation was in progress neither of the parties could withdraw the money without jeopardizing their rights, and it was *Sanborn's* duty to pay it to the party finally entitled thereto, and the statute of limitations did not begin to run until payment was demanded. It would hardly be contended that if this deposit had been made with the clerk of the court, as the statute requires, that officer could at the close of the litigation, regardless of any statute requiring him to pay the money, refuse to pay it over because it had been on deposit for more than six years, and there is little difference between the two situations.

The cases of *Shoemaker v. Hinze,* 53 Wis. 116, 10 N. W. 86, and *Curran v. Witter,* 68 Wis. 16, 31 N. W. 705, relied on by the appellant, have no application to this case. In each of those the relation of debtor and creditor existed between the depositor and the depositee as soon as the deposit was made, and action might be commenced at once to recover the amount so deposited. In the case before us a sum of money was deposited for the specific purpose of being paid to third parties on their complying with a prescribed condition. The plaintiffs could not accept and McLeod could not withdraw the deposit without waiving their rights to litigate the issues in the case, and it is perfectly plain that McLeod had no right of action against *Sanborn* until after making a demand for the return of the money. Sec. 4222, Stats. (1898), commences to run only after the cause of action has accrued. There was

no cause of action until *Sanborn* was guilty of some default. *McArthur v. Moffet,* 143 Wis. 564, 571, 128 N. W. 445; *Comm. v. McGowan,* 4 Bibb (Ky.) 62; *Cooper v. Cooper,* 61 Miss. 676, 696.    There was no denial of plaintiffs' right on *Sanborn's* part until he refused to comply with the demand made upon him.

It is insisted that plaintiff cannot recover because of the champertous agreement between McLeod and McDonnell and Irvine.    We do not see how this agreement affected the contract between McLeod and the defendant.    If the Emersons had themselves accepted the money and insisted on retaining it while they were trying to prevail on the champerty issue, we apprehend the court would make short shrift of that issue.    As a matter of fact they did not attempt the impossible feat of keeping their cake and eating it at the same time.    They directed the return of the money when the champerty issue was raised.    We find no error in the record.

*By the Court.*—Judgment affirmed.